Not for Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 99-31833 |
| EDWARD J. WATERS, | ) | CHAPTER | 7 |
| DEBTOR. | ) | ECF NOS. | 245, 694, 695, 701 |

**APPEARANCES**

Ann M. Nevins, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
915 Lafayette Boulevard, Room 309
Bridgeport, CT 06604

Attorney for Movant United States of America, Internal Revenue Service

Peter Sklarew, Esq.
Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, DC 20044

Attorney for Movant United States of America, Internal Revenue Service

Edward J. Waters
Avalon Place
137 Hollow Tree Ridge Road, #1903
Darien, CT 06820

*Pro Se* Debtor/Cross-Movant

Denise S. Mondell, Esq.
Assistant Attorney General
Attorney General's Office
55 Elm Street, 4th Floor
P.O. Box 120
Hartford, CT 06141-0120

Attorney for Movant (by Joinder) State of Connecticut, Department of Revenue Services

Richard M. Coan, Esq.
Coan, Lewendon, Gulliver & Miltenberger, P.C.
495 Orange Street
New Haven, CT 06511

Chapter 7 Trustee

**MEMORANDUM OF DECISION AND ORDER**
**ON MOTIONS FOR SUMMARY JUDGMENT RE:**
**MOTION TO SET ASIDE STIPULATED ORDER**

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matters before the court are (1) that certain Debtor's Amended Motion for Distribution of Proceeds of Sale of His Residence (ECF No. 245, the "Distribution Motion")[1] filed by the above-referenced debtor (the "Debtor"),[2] (2) that certain U.S. Motion for Summary Judgment Regarding Debtor's Right to Relief from 7/16/01 Stipulation Based on *Flor*, Duress, or Fraud (ECF No. 694, the "S/J Motion") filed by the United States Internal Revenue Service (the "IRS") with respect to the Distribution Motion[3] and (3) that certain Debtor's Opposition to "'U.S. Motion for Summary Judgment Regarding Debtor's Right to Relief from 7/16/2001 Stipulation Based on *Flor*, Duress, or Fraud'" and D[e]btor's "'Cross-Motion for Summary Judgment for Relief from 7/16/2001 Stipulation Based on *Flor*, *et al.*, Duress, or Fraud'" (ECF No. 701, the "Objection and Cross-Motion"). The court has jurisdiction over this contested matter as a core proceeding pursuant to

---

[1] References to the docket of this title 11 case appear in the following form: "ECF No. __".

[2] As used herein the term the "Debtor" refers to the above-referenced debtor in his prepetition identity, in his prior capacity as a chapter 13 debtor, his prior capacity as a chapter 11 debtor and debtor in possession and/or as a chapter 7 debtor, as the context requires.

[3] The State of Connecticut, Department of Revenue Services (the "DRS," collectively with the IRS, the "Taxing Authorities") objected to the Distribution Motion and (on a limited basis) joined in the S/J Motion pursuant to that certain Supplemental Memorandum of Law in Opposition to Debtor's Motion for Distribution to Him of Proceeds of Sale of His Residence and in Support of Summary Judgement [sic] (ECF No. 695, the "DRS Joinder").

28 U.S.C. §§ 157 and 1334, and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[4]

## I. BACKGROUND

Since 1991 the Debtor has filed five title 11 cases including:

- this title 11 case filed on December 19, 1997. This case originally was filed as a case under chapter 13 of the Bankruptcy Code and was assigned to the Honorable Alan H.W. Shiff but was reassigned to the undersigned by order dated May 6, 1999 and given the above-captioned docket number. As contemplated by the Stipulated Order (as hereafter defined), this case was converted to a case under chapter 11 of the Bankruptcy Code by order dated July 16, 2001. (*See* ECF No. 181.) Pursuant to the Debtor's motion, this case was converted further (the "Conversion") to a case under chapter 7 of the Bankruptcy Code on March 10, 2004. (*See* ECF No. 413.) The Debtor received his chapter 7 discharge (the "Discharge") on May 24, 2005. (*See* ECF No. 467.) Further relevant history of this case is set forth below in parts II and IV.

- a chapter 11 case filed in this district on June 2, 2000 (while this case was pending). That case originally was assigned to Judge Shiff but was reassigned to the undersigned by order dated September 26, 2000 and given a new docket number (Case No. 00-34156, the "2000 Chapter 11 Case"). That case was dismissed prior to plan confirmation in accordance with the Stipulated Order (as hereafter defined).[5]

On July 16, 2001, a certain Stipulation and Order (ECF No. 180, the "Stipulated Order") was entered by the court pursuant to the motion of the Debtor (ECF No. 171). The parties to the underlying stipulation (the "Stipulation") were the Debtor, the Taxing Authorities, CIIC (as that term is defined below), Dean 40 (as that term is defined below) and the then-serving chapter 13 trustee (the "Chapter 13 Trustee"). (*See* ECF No. 180.) From time to time and with the consent of

---

[4] That order referred to the "Bankruptcy Judges for this District *inter alia*" all proceeding arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . ."

[5] Earlier in this case, the court granted Alaska Seaboard (as hereafter defined) relief from stay (ECF No. 86, the "R/S Order") to foreclose the Mortgage (as hereafter defined) on the Property (as hereafter defined). The Debtor commenced the 2000 Chapter 11 Case at least in part to circumvent the R/S Order.

the parties, the court approved release of some of the Escrow Fund (as that term is defined below) held in accordance with the Stipulation. (*See, e.g.*, ECF Nos. 247, 278, 290, 429.) On March 28, 2002, the Debtor filed the Distribution Motion (as supplemented by additional filings (*see, e.g.*, ECF Nos. 297, 324, 337)) seeking (a) an interpretation of Paragraph 12 of the Stipulated Order (the "Interpretation Issue"), (b) to set the Stipulated Order aside (i) on the authority of *In re Flor,* 166 B.R. 512 (Bankr. D. Conn. 1994) (Krechevsky, J.), *aff'd,* No. 3:94CV1130, 1995 U.S. Dist. LEXIS 22407 (D. Conn. Mar. 20, 1995), *appeal dismissed,* 79 F.3d 281 (2d Cir. 1996) and *In re Gibbs,* 230 B.R. 471 (Bankr. D. Conn. 1999) (Shiff, J.), the Thirteenth Amendment to the United States Constitution, Conn. Gen. Stat. § 52-361a(i) and 11 U.S.C. § 510(a)[6] and (ii) for fraud and/or duress on the part of the Taxing Authorities (or at least the IRS) (subclauses (b)(i) (as expanded) and b(ii), collectively, the "Other Issues") and (c) the immediate distribution of the Escrow Fund to the Debtor (less the aggregate of certain identified taxes to be paid to the Taxing Authorities).[7]

A non-evidentiary hearing was held on the Distribution Motion on May 22, 2003. After that hearing (and the submission of court-solicited briefs) the court "determined that a trial on the merits

---

[6] The Debtor subsequently expanded that ground to include reliance upon *Local Loan Co. v. Hunt,* 292 U.S. 234 (1934). The foregoing ground, collectively with the subclause (b)(i) grounds, are referred to hereafter as the "*Flor* Issue."

[7] By order dated April 25, 2002, the court authorized (among other things) then-counsel for the Debtor to make a distribution from the Escrow Fund of $529,520.62 to the IRS "for the payment by Edward J. Waters of the federal taxes, penalties and interest owed for his tax years 1993 through 2000, and the payment of his estimated taxes for 2001." (ECF No. 247 at 1.) The IRS reserved its right to determine the amount due after completion of its review of tax returns to be filed by the Debtor. (*See id.*) That order also authorized a payment to the DRS from the Escrow Fund of $130,227.99 "representing income taxes interest and penalties owed by the Debtor as set forth on his tax returns for the years 1992, 1993, 1995, 1996, 1998, 1999 and 2000 taxes, interest and penalties in payment of capital gains taxes, for the years 1988, 1989 and 1990 . . . ." (*Id.*) The order also reserved the Debtor's right to file refund claims and to challenge any assessments. (ECF No. 247 at 2.)

of the [Distribution] Motion . . . [was] the most appropriate procedure for adjudicating the [Distribution] Motion [and the issues raised in the briefs] . . . ," (ECF No. 352 (the "Prior Order") at 1), and ordered the submission of a proposed amended pretrial order with respect to such trial (*id.* at 2). Subsequently, a Fourth Amended Pretrial Order (ECF No. 421) in respect of the Distribution Motion was entered in this case on March 25, 2004 and provided (among other things) for a trial date "to be set by further Order." At a hearing held on September 13, 2006, the court continued on the record the hearing on the Distribution Motion "without date." (*See* Oral Record of 9/13/2006 hearing at 4:33:42 *et seq.*)

At a hearing held on September 16, 2009, the court indicated on the record that it would revisit the Prior Order and the Interpretation Issue but only with respect to whether a trial was required concerning the Interpretation Issue. (*See* Oral Record of 9/16/09 hearing at 12:28:43 *et seq.*) On August 24, 2010, the court issued an amended "Brief Memorandum and Order" which resolved the Interpretation Issue without a trial. (*See* ECF No. 691, the "Interpretation Decision").[8] The Interpretation Decision was scheduled for a status conference on August 19, 2010 to consider "next steps" with respect to the Distribution Motion. (*See* ECF No. 691 at 8.) That status conference was held as scheduled. At the status conference, the Taxing Authorities expressed the opinion that the Other Issues now could be disposed of by summary judgment. (*See* Oral Record of 8/19/2010 Hearing at 4:00:10 *et seq*.) Accordingly, the court invited the Taxing Authorities to file motion(s) for summary judgment with respect to the Other Issues. (*See* Oral Record of

8 The Interpretation Decision is discussed in part II, below.

8/19/2010 Hearing at 4:02:50 *et seq*.) The IRS filed the S/J Motion on September 17, 2010.[9] The DRS filed the DRS Joinder on September 27, 2010. The Debtor filed the Objection and Cross-Motion on November 1, 2010. The IRS filed a response to the Objection and Cross-Motion on November 21, 2010. (*See* ECF No. 702.)

The matters now are ripe for the disposition set forth below.

## II. UNDISPUTED FACTS

At the beginning of 2001, (a) the Debtor owned a fee simple interest with respect to certain real property described as 40 Swift's Lane, Darien, CT (the "Property") (*see* Admissions No. 7) and (b) the Property was subject to a certain mortgage (the "Mortgage") held by Alaska Seaboard Partners Limited Partnership ("Alaska Seaboard") (*see* Admissions No. 25). At all relevant times, the Debtor was the sole shareholder, sole director, sole employee, Chairman, President and CEO of an offshore entity called Cape & Islands Investment Company Limited ("CIIC"). (*See* Admissions Nos. 9, 15.)[10] CIIC was formed under the laws of the Commonwealth of the Bahamas for the purpose of international investment banking. CIIC had a British Virgin Islands subsidiary with which it was merged in 1998. After the merger, CIIC continued to operate under the same name

---

[9] Annexed to the S/J Motion (*i.e.,* ECF No. 694) is a copy of that certain "Debtor's Response to the State of Connecticut Department of Revenue Services ('DRS') and the Internal Revenue Service ('IRS') Request for Admissions" (dated March 29, 2004, hereinafter, the "Admissions"). The Admissions also are attached to the DRS Joinder (*see* ECF No. 695).

[10] The Debtor is an attorney admitted to practice in the State of New York (Admissions No. 66), but is not admitted to practice in Connecticut. The Debtor is a 1971 graduate of Fordham Law School, and received an MBA in Finance from The Wharton School of the University of Pennsylvania in 1973. (*See* Admissions No. 67.) At the time the Debtor negotiated and entered into the Stipulation and at the time the Stipulated Order was entered, he was represented by counsel. (*See* ECF Nos. 170, 171, 180.) At present and (except, perhaps, for special tax counsel), the Debtor is *pro se* in these proceedings.

under the laws of the Territory of the British Virgin Islands, under its International Business Companies Act. (*See* Admissions Nos. 8, 9.) The Debtor had a contractual arrangement to receive, as wages and/or other personal compensation, all of CIIC's receipts less its expenses annually. (ECF Nos. 529 ¶ 4, 535 at 4-5.)

"As the President and Chief Executive Officer of CIIC, [the Debtor] . . . performed personal services for CIIC during 1998, 1999, and 2000 which were independently performed in its investment banking business and which, acting as an independent finder, assisted . . . [Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ")] to secure . . . [an] Acquisition Advisory engagement agreement with Repap Enterprises Inc." (Admissions No. 16.)[11] On November 27, 2000, CIIC invoiced DLJ for services provided by CIIC during 1998, 1999 and 2000 in assisting DLJ in securing such engagement agreement. For its services, CIIC invoiced DLJ for $895,749.00 and $8,838.54 for expenses. Earlier in the year 2000, CIIC had invoiced DLJ and been paid for services totaling $183,750.00. (*See* Admissions Nos. 16-20.)

The court scheduled an evidentiary hearing for November 29, 2000 to consider multiple pending motions both in this case and the 2000 Chapter 11 Case.[12] At the hearing held on November 29, 2000, the court agreed to consider the Debtor's motion to vacate the R/S Order under the

---

[11]    The court accepts the "personal services" label used by the Debtor for the purposes of these summary judgment proceedings only.

[12]    Among the matters scheduled for consideration were: confirmation of the Debtor's Third Amended Chapter 13 Plan and Objections thereto filed by the Taxing Authorities and Alaska Seaboard; the IRS's motion to convert the Chapter 13 case to Chapter 7; the IRS's motion to convert the Chapter 11 case to Chapter 7; the IRS's motion to compel the filing of tax returns; the Debtor's motion to determine the status of secured claims recorded against the Property; the Debtor's motion to vacate the R/S Order; the Debtor's second amended objection to Alaska Seaboard's claims; and Alaska Seaboard's motion for relief from stay (in the 2000 Chapter 11 Case) and motion to dismiss the 2000 Chapter 11 Case.

standards of Rule 60(b) of the Federal Rules of Civil Procedure, and indicated to the Debtor and his counsel that such a showing would have to include evidence that the Debtor's Third Amended Chapter 13 Plan was feasible. (*See* ECF No. 142 at 9:13-10:11 (remarks of court).) In support of his argument that the Third Amended Chapter 13 Plan was feasible, the Debtor testified that CIIC would be receiving approximately $895,000.00 in revenue from its operations and that those funds would be made available to pay Mortgage arrearages owed to Alaska Seaboard and make substantial inroads on the Debtor's tax debts. The Debtor also testified that as part of the same transaction, CIIC had received an earlier payment of $168,000.00. When asked how that $168,000.00 had been spent, the Debtor stated that it had been spent on normal expenditures of his family. (*See id.* at 31:17– 33:5 (testimony of the Debtor).) When pressed further as to whether the moneys had been taken as a salary the Debtor said, "I don't take a set salary. I take it out just like every other Sub S corporation would do the same thing . . . . I take it according to what's available and what the needs are." (*See id.* at 91:25–92:6 (testimony of the Debtor).) The court and the Taxing Authorities questioned whether the Debtor's total indebtedness would make him ineligible under 11 U.S.C. § 109(e) to be a Chapter 13 debtor. (*See id.* at 18:21–22:6 (remarks of court and counsel for the Taxing Authorities).) The court and the IRS then queried whether, in the event of the conversion of this case to Chapter 11, the Debtor might be ineligible to file a confirmed plan because the Debtor could be considered to be using wages from services to fund any such plan. (*See id.* at 22:22– 23:4; *id.* at 132:23–133:23; *id.* at 147:18 to 148:1 (remarks of court and counsel).) The hearing was continued to January 4, 2001. (*See id.* at 14:4-7; *id.* at 152.)

Thereafter, on January 3, 2001, the Debtor issued "wire instructions" under CIIC letterhead, directing DLJ to wire payment (the "Fee"), totaling $904,587.54 to Goldman, Gruder & Woods

LLC, attorneys for Alaska Seaboard, for the benefit of CIIC and Dean 40 Swift, LLC ("Dean 40"). (*See* Admissions Nos. 22-23.) Also, on January 3, 2001, Dean 40 purchased the subject mortgage note (the "Note") and took assignment of the Mortgage and judgment of foreclosure recorded against the Property by Alaska Seaboard. (*See* Admissions Nos. 25 and 32.) The original principal amount of the Note was $750,000.00 with a balance due on October 26, 2001 of $1,998,273.29. (*See* Admissions Nos. 26-27.) Dean 40 paid Alaska Seaboard $1,430,000.00 for the Note and Mortgage. (*See* Admissions No. 28.) The funds used to pay Alaska Seaboard came from two sources: (1) a loan of $526,316.00 from Tuthill Finance, a Connecticut Limited Partnership ("Tuthill"); and (2) a loan of $930,000.00 (including the Fee) from CIIC. (*See* Admissions No. 29.) The agreement among the above-referenced parties provided that, upon the foreclosure of the Property and assuming that Dean 40 successfully bid at the foreclosure sale, CIIC would have the right to conveyance of title to the Property to it in exchange for CIIC's execution and delivery of a new one-year interest-only note to Dean 40 in the amount of $526,316.00 (*i.e.*, the amount of the Tuthill loan), which would be secured by a first mortgage on the Property. CIIC would also have to pay a fee of $7,500.00, plus miscellaneous costs of the foreclosure. (*See* ECF No. 150 at 12:23–13:6; *id.* at 18:1–19:8 (testimony of Mr. Montgomery (sole member of Dean 40)).) Neither the court, nor the Taxing Authorities, nor the Chapter 13 Trustee were given prior notification with respect to the foregoing transactions (collectively, the "Dean 40 Transaction"). (*See, e.g.*, Admissions No. 23.) As demonstrated below, the Dean 40 Transaction had a substantial effect on the Debtor's subsequent positions and strategy.

When the evidentiary hearing reconvened on January 4, 2001, the Debtor advised the court that he no longer intended to contribute the $895,000.00 in funds into the proposed Third Amended

Chapter 13 Plan. Rather, the Debtor proposed a Fourth Amended Chapter 13 Plan in which he offered to make periodic payments to the Taxing Authorities over five years (the Dean 40 Transaction functionally having removed the Note from the purview of the chapter 13 plan). The Debtor also advised the court that he no longer sought to vacate the R/S Order, or sought a determination of secured status with respect to the Property. In fact, the Debtor stated that he had no objection to relief from stay entering in the 2000 Chapter 11 Case so that the foreclosure proceeding scheduled with respect to the Property for January 20, 2001 could go forward. (*See* ECF No. 150 at 7:9–8:13 (remarks of court and counsel).)

During closing remarks by counsel for the DRS at the January 4, 2001 hearing, the court queried counsel as to whether the funds the Debtor had received from CIIC constituted salary, dividends, distributions, or something else. (*See* ECF No. 150 at 98-99.) With no resolution reached, the court remarked, "Well, I'm going to give everyone an opportunity to file post trial briefs." (*See id.* at 99:10-11.) In her final remarks, counsel for the IRS asked the court to dismiss this case and convert the 2000 Chapter 11 case to a case under chapter 7 of the Bankruptcy Code. (*See* ECF No. 150 at 105.) In turn, Debtor's counsel asked that relief from stay be granted with respect to the Property in the 2000 Chapter 11 Case, and in response to the court's inquiry as to what other relief the Debtor sought, counsel listed the following: a date by which to file missing tax returns; a date to litigate objections to tax claims; and a date to consider confirmation of the Debtor's Fourth Amended Chapter 13 Plan. (*See id.* at 109.) The court directed the Debtor to brief the issue of his entitlement to such relief, as well as "whatever issues you deem relevant." (*See id.* at 110:12-13.) Without objection by any party, the court ordered the filing of simultaneous briefs with replies only upon court order. (*See id.* at 108, 115.)

The Dean 40 Transaction may have bought peace with Alaska Seaboard,[13] but the Debtor's disclosure of the same at the January 4, 2001 hearing agitated the Taxing Authorities considerably. Both of the Taxing Authorities responded by challenging the good faith and legality of the Dean 40 Transaction and seeking conversion of this case and of the 2000 Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code on that additional basis. (*See*, *e.g.*, ECF No. 160, ECF No. 161 (collectively, with the underlying motions, the "Motion To Convert").)[14]

On May 29, 2001, the Board of Directors of CIIC (consisting solely of the Debtor) declared "wages" to be paid to the Debtor for 1998, 1999 and 2000 and assigned CIIC's rights under a to-be-executed Amended Loan and Security Agreement (the "Amended Agreement") to the Debtor as security for the payment of such "wages." (*See* Admissions Nos. 44, 45.) On May 29, 2001, CIIC declared "wages" payable to the Debtor from "investment banking revenues" which it received from the Dean 40 Transaction and, in turn, CIIC then secured its "wage" obligation to the Debtor with an assignment to him of its interest under its loan agreement with Dean 40. (ECF Nos. 487, Exhibit III at tab 11, 542 at 7-8, 535 at ¶ 11.) On May 31, 2001, Dean 40, CIIC and the Debtor executed the Amended Agreement. (*See* Admissions Nos. 39-40.) The Amended Agreement provided for the sale of the Property and established the parties to whom distribution of the sale proceeds was to be made. (*See* Admissions No. 40-41.)[15] Among other things, the Amended Agreement provided that

---

[13] Alaska Seaboard and the Debtor had had a long and contentious history. (*See, e.g.*, ECF Nos. 85, 129.)

[14] ECF No. 127 (the IRS motion to convert, as supplemented by further filings and arguments), filed before the IRS knew about the Dean 40 Transaction, asserted that the Debtor was ineligible for chapter 13 relief under Bankruptcy Code § 109(e) and that the Debtor's proposed chapter 13 plan was infeasible and unconfirmable.

[15] An offer (the "Offer") to purchase the property was formally made and agreed to by the Debtor on April 25, 2001. (*See* ECF No. 487 Exhibit IV, tab 4 ("Offer to Purchase" signed

Tuthill would have a senior claim to repayment of its $526,316.00 loan, with interest and expenses, and the remainder of the Mortgage proceeds collected would go to CIIC. (ECF Nos. 529 ¶ 7, 533 ¶ 7.) All of the foregoing May, 2001 transactions appear to have been in anticipation of the Stipulation (at least in some sense), but it is unclear to what extent the Taxing Authorities knew about them when the parties executed the Stipulation.

The Motion To Convert was settled by the entry of the Stipulated Order entered in this case and in the 2000 Chapter 11 Case on July 16, 2001. (*See* ECF Nos. 170 (recitals), related docket entry for June 1, 2001, 180 (order dated July 16, 2001 approving the Stipulation).) As noted above, the parties to the Stipulation are the Debtor, the Taxing Authorities, CIIC, the Chapter 13 Trustee and Dean 40. (*See* ECF No. 180.) It is uncontested that the Stipulated Order became a final order on or about July 26, 2001. (*See, e.g.*, ECF No. 297 (filed by Debtor's then chapter 11 counsel).)

The Stipulated Order provided (in relevant part) for the following:

- The 2000 Chapter 11 Case was to be dismissed with a one year bar.
- This case was to be converted to a case under chapter 11 of the Bankruptcy Code (with the Debtor as debtor in possession).[16]
- The Debtor was authorized to market the Property at a price of no less than $2.075 million and to file by a date certain a motion to sell the Property free and clear of liens.
- The parties agreed that certain disbursements (including, but not limited to, satisfaction of the Tuthill Loan) could be made from the proceeds of the contemplated sale, with the remaining proceeds to be placed in escrow (the "Escrow") subject to other relevant provisions of the Stipulated Order and subsequent court order(s).

---

"accepted" by the Debtor on April 25, 2001).)

16 That conversion was effectuated by an order entered on July 16, 2001. (*See* ECF No. 181.)

The Stipulated Order also had specific provisions for the payment of prepetition and postpetition taxes:

- The Debtor was required to file certain tax returns by dates certain. (*See* ECF No. 180 ¶ 1.)  The Taxing Authorities could file amended proofs of claim and/or administrative claims within a certain time period and the Debtor could file claim objections within a certain time period. (*See* ECF No. 180 ¶¶ 1, 3.)

- "Any taxes reflected as being due on the filed tax returns of the Debtor for the years 1993 through 1996 will be paid out of the . . . [Escrow] in accordance with a confirmed Chapter 11 Plan, as prepetition obligations of the Debtor.  Any additional taxes of the Debtor claimed to be due by the IRS and DRS as reflected in their filed amended proofs of claim will also be paid out of the . . . [Escrow] upon their allowance by the Court in accordance with applicable Bankruptcy Code provisions."  (ECF No. 180 ¶ 13.)

- "Any taxes reflected to be due on the filed tax returns of the Debtor for the years 1997 through 2000, and any estimated income taxes due for 2001, will be paid out of the . . . [Escrow] upon approval by and further order of the Court.  Any additional taxes of the Debtor claimed to be due by the IRS and DRS as reflected on any filed administrative expense claims will also be paid out of the . . . [Escrow] upon their allowance by the Court in accordance with applicable Bankruptcy Code provisions.  Nothing this [sic] Stipulation and Order modifies or is intended to modify any rights the parties may otherwise have under non-bankruptcy law."  (ECF No. 180 ¶ 14.)

- "The Debtor, Dean 40 and CIIC agree that to the full extent of their respective rights, if any, in the . . . [Escrow] funds [the "Escrow Fund"], said parties hereby subordinate such rights to the payment of taxes owed by Edward J. Waters to the IRS and DRS."  (ECF No. 180 ¶ 12, the "Subordination Provision".)[17]

Consistent with the Stipulated Order, a sale of the Property (pursuant to the Offer) was approved by this Court in accordance with Bankruptcy Code § 363; that sale closed on October 26,

---

[17] The Debtor has asserted in the Distribution Motion and otherwise that he now holds the interests of Dean 40 and CIIC in and to the Escrow (*see* Distribution Motion ¶ 8 at 4; ECF No. 487, Exhibit III at tab 14; Oral Record of 3/10/04 Hearing at 2:06:17 – 2:06:38) and the court proceeds on that assumption.

2001. (*See* ECF No. 215; Admissions No. 37.) The sale produced a taxable gain which resulted in an administrative claim (the "Gains Tax") against the Debtor strictly in his capacity as debtor in possession (*i.e.*, the chapter 11 estate), but no liability against the Debtor individually. (*See* ECF No. 590 (debtor and chapter 11 estate are separate taxable entities).) In ECF No. 691 (*i.e.*, the Interpretation Decision), the court determined that the phrase "taxes owed by Edward J. Waters" in the Subordination Provision included the Gains Tax. (The Debtor had urged the contrary position.)

The sale resulted in proceeds, net of adjustments, of $2,077,922.00. (*See* ECF No. 590 at 11 ¶ 9.)[18] Property taxes of $124,793.00 were paid directly from the proceeds of the sale. (*See id.*) The balance of net sale proceeds was paid with respect to the Mortgage, but did not fully satisfy the then-current Mortgage balance of $1,988,273.29. (*See* Admissions No. 38; ECF Nos. 529 ¶ 9, 533 ¶ 9.) The amount paid with respect to the Mortgage included $1,224,042.00 in accrued interest. (*See* ECF Nos. 529 ¶ 10, 533 ¶ 10.) The amount payable to CIIC but (pursuant to the Stipulation) deposited instead into the Escrow, after paying off Tuthill, was $1,287,206.00. (*See* ECF No. 590 at 11 ¶ 11.) On or about October 26, 2001, Dean 40 assigned its rights with respect to the Mortgage to CIIC which, on the same day, assigned those rights to the Debtor. (*See id.* ¶ 11B; ECF No. 487, Exhibit III at tab 14.)

## III. <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is appropriate only if the pleadings and submissions . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d

[18] Any references herein to paragraphs of ECF No. 590 are references of paragraphs of the "Uncontested Facts" section thereof.

162, 166 (2d Cir. 1999). *See also* Fed. R. Civ. P. 56(c) (made applicable here by Fed. R. Bankr. P. 7056). The movant bears the burden of establishing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The court must view all ambiguities and draw all reasonable inferences in the light most favorable to the nonmovant. *See Novak v. Blonder (In re Blonder)*, 246 B.R. 147, 150 (Bankr. D. Conn. 2000) (Krechevsky, J.) (citation and internal quotation marks omitted). Ultimately, the role of the court is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. ANALYSIS (RULE 60(b))

### A. The Distribution Motion Is an Attack on the Stipulated Order to which Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b) Apply

#### 1. Stipulated Order ¶ 14 Is not an "Escape Hatch" from the Subordination Provision[19]

The Debtor argues that the use of the language in paragraph 14 of the Stipulated Order that "[n]othing this [sic] Stipulation and Order modifies or is intended to modify any right the parties may otherwise have under non-bankruptcy law," was intended to preserve the Debtor's right now to challenge the validity of the Subordination Provision. That argument cannot prevail as a matter of law for the reasons aptly stated by the DRS in its Memorandum of Law in Opposition to Debtor's Motion for Distribution to Him of Proceeds of Sale of His Residence (ECF No. 307):

> The [last sentence of paragraph 14] is contained within and modifies [the remainder of paragraph 14] which provides that undisputed tax liabilities reflected on the debtor's returns or determined to be due by the DRS and/or IRS will be paid out of the escrow funds. Its placement in that . . . [paragraph] demonstrates that it was merely intended to preserve all of the rights of the various parties under state and federal tax law to the extent the parties failed to agree on the amount of tax due.[[20]] Considering the long history of litigation between the IRS and debtor, it would not be unexpected that the amount of tax due would be a matter of contention. It makes no logical sense for the parties to have agreed upon the inclusion of a provision which could have had the effect of nullifying the entire purpose of the Stipulation [and Stipulated Order].

(ECF No. 307 at 11.)

---

[19] The law governing interpretation of the Stipulated Order was discussed in the Interpretation Decision which discussion is incorporated by reference as if fully set forth herein. (*See* ECF No. 691 at 4-6.)

[20] Had the language in question been intended to open the Subordination Provision to attack, it would have been included in the Subordination Provision.

**2. Attack on a Final Order**

As noted above, the Stipulated Order is a final order. In *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367 (2010) ("*Espinosa*"), the Supreme Court articulated the consequences of a final order:

> The Bankruptcy Court's order confirming Espinosa's proposed plan was a final judgment from which United did not appeal. Ordinarily, "the finality of [a] Bankruptcy Court's orders following the conclusion of direct review" would "stan[d] in the way of challenging [their] enforceability." Rule 60(b), however, provides an "exception to finality," that "allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances."

*Espinosa*, 130 S. Ct. at 1376 (citations omitted; alterations in original). Accordingly, a discussion of Rule 60(b) follows.

**B. Rule 60(b) (In General)**

Rule 60 states in relevant part as follows:

> (b) **Grounds for Relief from a Final Judgment, Order, or Proceeding**. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

(c) **Timing and Effect of the Motion**.

(1) *Timing*. A motion under Rule 60(b) must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2) *Effect on Finality*. The motion does not affect the judgment's finality or suspend its operation.

(d) **Other Powers to Grant Relief**. This rule does not limit a court's power to:

(1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

(2) grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or

(3) set aside a judgment for fraud on the court.

Fed. R. Civ. P. 60. It is well established that "Rule 60(b) is not a vehicle for rearguing the merits of the challenged decision." *Williams v. Artus,* No. 06-CV-0356(VEB), 2008 WL 4516241, at *2 (W.D.N.Y. Oct. 2, 2002) (citing cases). The party seeking relief from a judgment bears the burden of proof. *See Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004).

The Debtor has not identified the subsection(s) of Rule 60(b) on which he relies. Accordingly, it falls to the court to review the Debtor's arguments and to identify those provisions of Rule 60(b) which arguably might apply. Accordingly, the court will analyze each provision of Rule 60(b) with respect to its arguable (and ultimate) applicability.

## C. The Stipulated Order Is Not "Void" Within the Purview of Rule 60(b)(4)

### 1. Rule 60(b)(4) (Applicable Law)

As noted above, Rule 60(b)(4) provides for relief from a final order if the order is "void" (*see* Fed. R. Civ. P. 60(b)(4)). "Void[ness]" is determined as of the date of entry of the challenged order. *See V.T.A. Inc. v. Airco, Inc.*, 597 F.2d 220, 224 n.9 (10th Cir. 1978) ("[I]f a judgment is void, it is

a nullity from the outset."); *Jordan v. Gilligan*, 500 F.2d 701, 704 (6th Cir. 1974) ("A void judgment is a legal nullity."). *Cf. Jones v. Giles*, 741 F.2d 245, 248 (9th Cir. 1984) ("A void judgment, as opposed to an erroneous one, is legally ineffective from its inception."). The most recent leading case on the construction of "void" as used in Rule 60(b)(4) is *Espinosa*.

In *Espinosa*, a chapter 13 plan provided for payment of principal due on the debtor's student loan debt (which was within the purview of 11 U.S.C. § 523(a)(8)). However, the plan provided for discharge of accrued interest on the student loan debt without any determination of Section 523(a)(8) "undue hardship." The student loan lender received notice of the plan and the confirmation hearing thereon, but did not object to plan confirmation. The plan was confirmed in 1993 without any determination of Section 523(a)(8) "undue hardship."[21] The confirmation order became final. The debtor received his discharge in 1997. In 2000, the lender's assignee attempted to collect the accrued interest portion of its debt. The debtor defended on his discharge. In 2003, the lender's assignee sought to set aside the confirmation order as "void" under Rule 60(b)(4). The bankruptcy court ruled for the debtor but, on appeal, the district court reversed. On appeal to the United States Court of Appeals for the Ninth Circuit (and after the correction of a clerical error in the discharge), the Ninth Circuit reversed the district court. In *certiorari* proceedings, the United States Supreme Court affirmed the Ninth Circuit. *Espinosa*, 130 S. Ct. at 1379-80.

The *Espinosa* Court concluded that the bankruptcy court committed a legal error when it confirmed the chapter 13 plan without a determination of Section 523(a)(8) "undue hardship" even

---

[21] At that time there was no Supreme Court authority that confirmation of such a plan even if there was no objection from the student lender was error. *Cf. Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193 (9th Cir. 2008) (*Espinosa* opinion in the court below) (finding that right to Section 523(a)(8) (and Rule 7001(6)) procedures arises only if lender objects).

in the absence of objection by the lender. *See Espinosa*, 130 S. Ct. at 1381 ("[T]o comply with § 523(a)(8)'s directive, the bankruptcy court must make an independent determination of undue hardship before a plan is confirmed, even if the creditor fails to object . . . ."). However, the foregoing error did not render the confirmation order "void," the Supreme Court held.

The Court articulated the standard for "void" within the purview of Rule 60(b)(4) in relevant part as follows:

> A void judgment is a legal nullity. Although the term "void" describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final. The list of such infirmities is exceedingly short; otherwise, Rule 60(b)(4)'s exception to finality would swallow the rule.
>
> "A judgment is not void," for example, "simply because it is or may have been erroneous." . . . Instead, Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard . . . .
>
> Federal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an "arguable basis" for jurisdiction. *Nemaizer v. Baker*, 793 F.2d 58, 65 (C.A.2 1986); *see, e.g.*, *[United States v.] Boch Oldsmobile [Inc.]*, [909 F.2d 657], 661-662 [(1st Cir. 1990)] ("[T]otal want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and . . . only rare instances of a clear usurpation of power will render a judgment void" (brackets and internal quotation marks omitted)).

*Espinosa*, 130 S. Ct. at 1377-78 (some citations omitted). *Cf. Central Vermont Public Service Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003) ("[A] judgment may be declared void for want of jurisdiction only when the court plainly unsurped jurisdiction, or, put somewhat differently, when there is a total want of jurisdiction and no arguable basis on which it could have rested a finding that it had jurisdiction." (citation and internal quotation marks omitted)).

### 2. No Fatal Jurisdictional Defect (*Flor* Issue)

For ease of analysis, the court will assume (but not decide) that the Stipulated Order was erroneously entered and that such error was (subject matter) jurisdictional in nature.[22] As explained below, in this case, as a matter of law such an (assumed) jurisdictional error does not render the Stipulated Order "void" within the purview of Rule 60(b)(4).

#### a. *In re Flor* and *In re Gibbs* do not render the Stipulated Order "void"[23]

The Debtor argues that the Stipulated Order is void under Rule 60(b)(4) because it is contrary to *In re Flor,* 166 B.R. 512 (Bankr. D. Conn. 1994) ("*Flor I*"), *aff'd,* Civ. No. 3:94CV1130(AVC), 1995 U.S. Dist. LEXIS 22407 (D. Conn. Mar. 20, 1995) ("*Flor II*"), *appeal dismissed,* 79 F.3d 281 (2d Cir. 1996), and *In re Gibbs*, 230 B.R. 471 (Bankr. D. Conn. 1999).

In *Flor I,* the debtors proposed to fund their chapter 11 plan in substantial part from future wages over a period of seven years. *See Flor I* at 513. No creditor objected to confirmation. However, the *Flor I* bankruptcy court *sua sponte* denied confirmation. The court concluded that the plan could not be confirmed because the debtor's commitment of future wages to the plan was an assignment of future wages which frustrated the bankruptcy fresh-start policy articulated more than

---

[22] However, the assumption of error does not apply to the Debtor's Thirteenth Amendment argument. The Fee was paid to or for the benefit of CIIC on or before January 3, 2001. Accordingly, the Debtor had already voluntarily toiled to bring forth the Fee prior to the entry of the Stipulated Order. There was no "involuntary servitude" involved and the Thirteenth Amendment is not implicated.

[23] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended chapter 11 of the Bankruptcy Code in certain facially relevant ways. However, this case was commenced prior to the effective date of BAPCPA and, accordingly, BAPCPA does not apply here. *See In re Dapontes,* 364 B.R. 866 (Bankr. D. Conn. 2007) (Shiff, J.) (finding BAPCPA amendments inapplicable).

sixty years earlier in *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934) (discussed below). *See Flor I* at 514-15.

In *Flor II*, "[t]he issue to be resolved on appeal . . . [was] whether the debtor's future wages . . . [could be used to] fund the chapter 11 plan of reorganization." *Flor II*, at *1. The *Flor II* district court noted that Section 52-361a(i) of the Connecticut General Statutes prohibits voluntary assignments of wages. *See Flor II*, at *6. Accordingly, *Flor II* affirmed *Flor I* observing that "[t]o permit the debtors to use future wages to fund the plan at issue would be contrary to the policy underlying the bankruptcy act, *see supra Local Loan v. Hunt*, and Connecticut law. *See* Conn. Gen. Stat. § 52-361a(i)." *Flor II*, at *6-*7. On appeal of *Flor II* to the United States Court of Appeals for the Second Circuit, the Second Circuit dismissed the appeal as an appeal of an interlocutory order that was outside its jurisdiction. *See In re Flor*, 79 F.3d 281.

In *Gibbs*, *supra*, the debtor also relied upon his future wages to fund his chapter 11 plan in substantial part. *See Gibbs*, 230 B.R. at 473. Although Judge Shiff noted that such plan provision "appear[ed] . . . to conflict with the analysis in . . . [*Flor I* and *Flor II*]," *Gibbs*, 230 B.R. at 273, Judge Shiff did not actually deny confirmation on that basis. *See id.* at 474 ("It is clear . . . that the Plan cannot be confirmed even without reliance on *Flor*."). Rather, confirmation was denied on a classification issue. *See Gibbs*, 230 B.R. at 274. However, in *Dapontes*, *supra*, Judge Shiff squarely adopted *Flor I* and *Flor II* in his ruling denying confirmation. *See Dapontes*, 364 B.R. at 867-68.

*Flor I*, *Flor II*, *Gibbs* and *Dapontes* (collectively, "*Flor I, et al.*") all applied to proposed chapter 11 plans which relied on future earnings as a funding source. Here, the Debtor already had toiled to produce the "wages" that the Debtor agreed to make available to pay the Taxing Authorities. Notwithstanding that those "wages" were perhaps not yet technically payable to the

Debtor, it would not have been unreasonable for this court to distinguish the "wages" at issue here from the wages at issue in *Flor I, et al.* on the basis that the "wages" at issue here already had been earned. (*See* ECF No. 694 at 4-5; Admissions No. 44.) Accordingly, even if the Subordination Provision was contrary to *Flor I, et al.*, this court's entry of the Stipulated Order was not so insupportable as to render the Stipulated Order "void" within the purview of Rule 60(b)(4).[24]

**b. *Local Loan Co. v. Hunt* does not render the Stipulated Order "void"**

The Debtor further argues that the Stipulated Order is void because it is contrary to *Local Loan Co. v. Hunt*. In *Local Loan,* the debtor had executed and delivered a prepetition assignment of wages in connection with a prepetition loan. On March 3, 1931, the debtor filed his bankruptcy petition under the Bankruptcy Act of 1898 (as in effect in 1934, the "Bankruptcy Act"). The debtor was adjudicated a bankrupt and received his discharge on October 10, 1932. On October 18, 1932, the wage assignee sued the debtor's employer in Chicago municipal court seeking to enforce the wage assignment in respect of wages earned after the adjudication. The debtor went back into federal (bankruptcy) court to enjoin the municipal court enforcement suit. *Local Loan*, 292 U.S. at

---

[24] *Flor I, et al.* each allude to 11 U.S.C. § 541(a)(6) (including as property of the estate "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case* . . . ." (emphasis added)). The Debtor argues that "[s]ince the . . . [Escrow Fund] were asserted [by the Debtor] to be exempt under [11 U.S.C.] § 541(a)(6), the Debtor asserted that they were beyond the Court's jurisdiction." (ECF No. 701 at 5.) As discussed above, it would not have been unreasonable for the court to conclude that the "wages" in question were already earned as of issuance of the Stipulated Order. As discussed below, given the foregoing it would not have been unreasonable for the court to conclude that such already-earned "wages" were voluntarily assignable. Although the "wages" may not have been involuntarily (and automatically) made subject to the court's jurisdiction pursuant to Section 541(a), given all of the foregoing it would not have been unreasonable for the court to conclude that the already earned "wages" could voluntarily be placed (*i.e.*, assigned) within the court's jurisdiction pursuant to the Escrow provisions of the Stipulated Order.

238. The District Court granted the injunction and the United States Court of Appeals for the Seventh Circuit affirmed.

On *certiorari* to the Supreme Court, the creditor argued (*inter alia*) that the court below erred in not applying the rule (a minority rule) followed by the highest court of the State of Illinois (the jurisdiction whose law governed the wage assignment) that such an assignment created a "lien" on future wages within the purview of Section 67d of the Bankruptcy Act as of the date of the assignment, and that such lien was unaffected by the debtor's discharge.[25] In affirming the Seventh Circuit, the Supreme Court supported the state-law majority view that an assignment of future wages was not a "lien" within the protection of Section 67d:

> The discharge in bankruptcy operated to discharge these obligations as of the date of the adjudication, so that the obligations were discharged before the wages intended as security were in existence. The law does not continue an obligation in order that there may be a lien, but only does so because there is one. The effect of the discharge upon the prospective liens was the same as though the debts had been paid before the assigned wages were earned. The wages earned after the adjudication became the property of the bankrupt clear of the claims of all creditors.
>
> . . .
>
> The earning power of an individual is the power to create property; but it is not translated into property within the meaning of the Bankruptcy Act until it has brought earnings into existence. An adjudication of bankruptcy, followed by a discharge, releases a debtor from all previously incurred debts, with certain

---

[25] At issue was a construction of Bankruptcy Act § 67d. Section 67d provided as follows in 1934: "Liens given or accepted in good faith and not in contemplation of or in fraud upon the provisions of this title, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall, to the extent of such present consideration only, not be affected by . . . [the discharge]." 11 U.S.C.A. § 107(d) (repealed). Construction of Section 67d was necessary to resolve the issue in *Local Loan* because there was no analogue to 11 U.S.C. § 552(a) under the Bankruptcy Act. *Cf.* 11 U.S.C.A. § 552(a) (West 2011) ("Except as provided in subsection (b) of this section [not here relevant], property acquired by . . . the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.").

> exceptions not pertinent here; and it logically cannot be supposed that the act nevertheless intended to keep such debts alive for the purpose of permitting the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt.

*Local Loan,* 292 U.S. at 242-43 (internal quotation marks omitted).

Moreover, the Supreme Court deviated in *Local Loan* from the general rule that, in bankruptcy, property interests (*e.g.,* what generally constitutes a "lien" for bankruptcy purposes) are defined by applicable state (there Illinois) law. The Court deviated from that general rule for the stated reason that the minority Illinois rule was "destructive of the purpose and spirit of the Bankruptcy Act." *Id*. at 245. Accordingly, the Court held that an assignment of "future wages" was not a "lien" on the debtor's postbankruptcy wages within the purview of Bankruptcy Act § 67d notwithstanding contrary state law. *Local Loan,* 292 U.S. at 244-45.[26]

---

[26]

> The various provisions of the Bankruptcy Act were adopted . . . and are to be construed when reasonably possible . . . so as to effectuate the [fresh start policy of the Bankruptcy Act] . . . . Local rules subversive of that result cannot be accepted as controlling the action of a federal court.
>
> When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either. The amount of the indebtedness, or the proportion of wages assigned, may here be small, but the principle, once established, will equally apply where both are very great. The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy. . . . [W]e reject the Illinois decisions as to the effect of an assignment of wages earned after bankruptcy as being destructive of the purpose and spirit of the

As discussed above, the wages in *Local Loan* were unearned as of the time of the assignment (and the adjudication) and it would not be unreasonable for this court so to have limited *Local Loan's* applicability here. Moreover, even if the Escrow Fund is composed of wages, as discussed above, it would not have been unreasonable for this court to find that those "wages" were earned prior to the entry of the Stipulated Order. Accordingly, even if the Subordination Provision was contrary to *Local Loan*, as a matter of law this court's entry of the Stipulated Order was not so insupportable as to render the Stipulated Order "void" within the purview of Rule 60(b)(4).

**c. Conn. Gen. Stat. § 52-361a(i) does not render the Stipulated Order "void" within the purview of Rule 60(b)(4)**

Section 52-361a of the Connecticut General Statutes (titled "Execution on wages after judgment") provides in relevant part as follows: "(i) *Assignment of earnings.* Any assignment by an employee of his earnings shall be void . . . . " Conn. Gen. Stat. Ann. § 52-361a (West 2011). Notwithstanding Section 52-361a(i)'s use of the term "void," *Espinosa* controls what is "void" for purposes of Rule 60(b)(4), not Section 52-361a(i). *See Espinosa, supra. See also Kinnear Corp. v. Crawford Door Sales Co.,*49 F.R.D. 3, 6-7 (D.S.C. 1970) ("When a motion is made under . . . [Rule 60(b)] to vacate a default judgment, state court decisions do not control the interpretation of that rule and the determination of whether the judgment should be set aside.").

There is authority to support the proposition that "[a]s a general rule, the right to receive . . . salary . . . which ha[s] . . . been earned, may be assigned, and except as otherwise provided by statute, such an assignment is valid and not in contravention of public policy. For instance, claims

---

Bankruptcy Act.

*Id.*

for wages by employees of a [bankrupt] corporation . . . are assignable." 6A C.J.S. *Assignments* § 24 (2011) (footnotes omitted). The parties have not called to the attention of the court, nor has the court located, any cases adjudicating the issue of whether the assignment prohibition of Section 52-361a(i) applies to assignments of already earned wages. As discussed above, the court would not have unreasonably found that the "wages" at issue had already been earned at the time of issuance of the Stipulated Order. Given the extant legal landscape, it would not be unreasonable for the court to have concluded that Section 52-361a(i) did not apply to the already-earned "wages" here at issue. Accordingly, this court's issuance of the Stipulated Order (containing the Subordination Provision) as a matter of law was not so insupportable as to render the Stipulated Order "void" within the purview of Rule 60(b)(4).[27]

**3. <u>No Denial of Due Process</u>**

There are but two potential reasons to consider a judgment "void" for violation of due process. The first is a lack of notice. *See Espinosa*, 130 S. Ct. at 1377. The second is where the court itself violates due process by depriving a party of the opportunity to be heard, whether by its own action or by improperly allowing a party's action. *See id*; *Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1099 (2d Cir. N.Y. 1979) (A judgment is

---

[27] The Debtor's reliance upon 11 U.S.C. § 510(a) adds nothing to the analysis. Section 510(a) provides: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C.A. § 510(a) (West 2011). The Debtor's reliance upon Section 510(a) is fruitless for two reasons. First, Section 510(a) applies to prepetition subordination agreements. *See In re Plymouth House Health Care Center*, No. 03-19135, 2005 WL 2589201, at *9 (Bankr. E.D. Pa. Mar. 15, 2005). It is not a device to invalidate a bankruptcy-approved postpetition subordination agreement after the fact. Second, the Debtor's reliance upon Section 510(a) is just another way of saying that the court's approval of the Stipulated Order (*i.e.*, Subordination Provision) was erroneous. However, for the reasons set forth above such an alleged error (if error there was) as a matter of law was not so blatant as to render the Stipulated Order "void" within the purview of Rule 60(b)(4).

"void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if *it* acted in a manner inconsistent with due process of law." (citation omitted; emphasis added)). In the proceedings surrounding the Stipulated Order, there is no allegation of any issue regarding notice. Indeed, the Debtor himself was the proponent of the motion to approve the Stipulation. (*See* ECF No. 171.) Similarly, there is no allegation that the *court* did anything to deprive the Debtor of due process. As it is undisputed that the Debtor had actual notice of the Stipulated Order and that the court did not deny the Debtor the opportunity to be heard, the Stipulated Order is not "void" and relief under Rule 60(b)(4) is not appropriate under the circumstances presented here as a matter of law.

### D. The Stipulated Order Cannot Be Set Aside for Fraud or Duress (Rule 60(b)(3))

#### 1. Fraud

##### b. One-year bar[28]

Rule 60(c)(1) of the Federal Rules of Civil Procedure governs Rule 60(b)(3). Rule 60(c)(1) requires that a motion seeking 60(b)(3) relief "be made within a reasonable time — . . . no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). The one year limitation period imposed by Rule 60(c)(1) on Rule 60(b)(3) motions is "absolute." *Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir.), *cert. denied*, 531 U.S. 968 (2000). *See also Gazes v. DelPrete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000) ("[T]he one year period [limiting Rule 60(b)(3)] is an absolute, outside limit, and a court lacks the power to grant motions filed beyond that time."). There are no exceptions to this rule based on the

[28] The court notes that "fraud on the court" is outside the one-year limitation imposed by Rule 60(c)(1). *Cf.* Fed. R. Civ. P. 60(d)(3). However, as determined *infra*, the "fraud on the court" allegation fails as a matter of law.

appeal process, ignorance of the alleged fraud, or other extenuating circumstances in the case. *See, e.g.*, *King v. First Am. Investigations, Inc.*, 287 F.3d 91 (2d Cir.) (per curium), *cert. denied*, 537 U.S. 960, *reh'g denied*, 537 U.S. 1098 (2002) (holding Rule 60(b)(3) relief inappropriate where the final judgment was entered August 12, 1998 and the motion to vacate was filed May 11, 2000; rejecting the pendency of appeal as a factor that tolled the one year period in a 60(b)(3) motion).

The Debtor alleges that the IRS committed fraud on the debtor by "'corrupt[ing]' the hearings of 11/29/2000 and 1/4/2001 by asserting false and fabricated tax claims as based on deficiency determinations . . . ." (ECF No. 701 ¶ 25.) The Debtor further claims that those deficiency determinations did not actually exist or were somehow otherwise false. (*See* ECF No. 701 at 19-20 n.1.) Further, the Debtor argues that the assertion by the IRS of those "fabricated claims" "was intentional, or in reckless disregard for the truth, . . . constituted both a Fraud On The Court under F.R.Civ.P. 60(b), and a Fraud On The Debtor under F.R.Civ.P. 60(b)(3)," (*id*. ¶ 31) and was made for the purpose of contesting the feasibility of the Debtor's then-pending chapter 13 plan and ultimately "as the basis for seeking the immediate dismissal of the Debtor's Chapter 13 case," (*id.* ¶ 25). The Debtor's argument continues that due to the impending dismissal of his chapter 13 case (due to the "fabricated claims") and the loss of the Property (*id*. ¶ 29), he entered into the Stipulation which provided for the conversion of his chapter 13 case to a case under chapter 11. The Debtor further claims in the Objection and Cross-Motion that the Distribution Motion contained a request for relief under Rule 60(b), or generally for fraud and duress. (*See* ECF No. 701 at 17.)

The Distribution Motion mentioned neither fraud nor Rule 60(b)(3) but sought a determination under *Flor*, *Gibbs* and 11 U.S.C. § 510(a). When the Debtor cites to the Distribution Motion as evidence that he complied with the one-year time restriction, he refers to paragraphs 13

and 14 thereof, which do not mention fraud, but instead (1) allege that the Debtor was eligible for chapter 13 relief and would have been able to propose a feasible chapter 13 plan (*see* ECF No. 245 ¶ 13) and (2) point out inconsistencies in the Taxing Authorities' statements of his tax liabilities over time (*see* ECF No. 245 ¶ 14). Pointing out that the IRS may have been inconsistent in its evaluation of his case from one time to another and arguing possible chapter 13 compliance is not equivalent to asserting that the IRS purposefully fabricated certain figures in order to prevent the court from approving the Debtor's chapter 13 plan. Consequently, the court is unable to locate any support in the record to show that the Debtor cited to fraud within the relevant one-year time frame.[29] In order properly to qualify for consideration of a request for relief under Rule 60(b)(3), the Debtor needed to allege fraud within one year of entry of the Stipulated Order. Because the Debtor made no mention of fraud with respect to the Stipulated Order between July 16, 2001 and July 16, 2002, his Rule 60(b)(3) claim for relief from the Stipulated Order is time-barred by Rule 60(c)(1) as a matter of law.

---

[29] In fact, a review of the court docket reflects that fraud and/or duress was first raised in these proceedings by the IRS. On April 7, 2003 (outside of the applicable one-year time frame), the IRS filed a brief in opposition to the Distribution Motion. In that brief, the IRS stated:

> Here, the Debtor has not alleged that there was fraud, overreaching, duress or mistake with respect to the Stipulation. Nor has the Debtor articulated any basis for being relieved of the binding, conclusive effect of the Stipulation. There are no allegations of surprise, mistake, misunderstanding or duress.

(ECF No. 316 at 6.) In his reply brief dated April 28, 2003, the Debtor states in a footnote that "the claim by the DRS [sic] that the . . . [Debtor] was under no duress is rebutted by Court testimony of the . . . [Debtor] in November, 2000 . . . ." (ECF No. 324 at 4 n.3.) The Debtor then quotes from the transcript of that hearing. (*See* ECF No. 142 at 136-40.) No further mention of fraud and/or duress was made in that reply brief. The Debtor first squarely raised the issue of fraud on the debtor/on the court and duress in a document filed on October 15, 2003. (*See* ECF No. 373 at 4-8.) Consequently, any allegation of fraud and duress was made after the applicable one-year period.

Further, even if the court liberally construed paragraphs 13 and 14 of the Distribution Motion as allegations of fraud (and therefore bring such allegations within the one-year period), the Debtor could not prevail as a matter of law for the reasons discussed below.

**b. Merits**[30]

As noted above, the court previously addressed the Debtor's allegations of fraud on the court and fraud on the debtor in the Prior Decision. In that decision, the court found and/or concluded that no genuine issue of fact existed with respect to the following facts:

> 7A. The IRS filed a Proof of Claim (the "1998 Proof of Claim"), dated February 4, 1998, during the chapter 13 phase of this case. In the Proof of Claim, the IRS asserted total unsecured general claims for the Debtor's tax returns for years 1988 through 1993 as "assessments pending" in the amount of $686,267.15. (*See* Doc. I.D. No. 536 ¶ 6, 542 at 15.)
>
> . . .
>
> 7D. The tax claims asserted in the 1998 Proof of Claim for general unsecured claims for tax years 1988 through 1993 in the amount of $686,267.15 had never been

---

[30] The IRS contends that "[a]s a matter of law, any claim of fraud is precluded by law of the case [i.e., the Prior Decision (as defined below)] and otherwise meritless." (ECF No. 694 at 7.) However, the law of the case doctrine is inapplicable here. *See Sussman v. Crawford*, 548 F.3d 195, 198 (2d Cir. 2008) (stating that law of the case "is at its least binding in the context of interlocutory orders" (citations and internal quotation marks omitted)). *See also Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 905 (8th Cir. 2010 ("The law-of-the-case doctrine only applies to final orders, not interlocutory orders."); *Botvin v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 223 (D. D.C. 2011) (Under Fed. R. Civ. P. Rule 54(b), "[i]nterlocutory orders may always be reconsidered prior to final judgment and *are not subject to the law of the case doctrine*." (citation and internal quotation marks omitted; emphasis added)). Here, the court issued that certain Memorandum of Partial Decision and Order Re: Motion for Determination of Tax Liabilities (ECF No. 590, as modified by ECF Nos. 602, 617, the "Prior Decision") which adjudicated (among other things) various theories of fraud alleged by the Debtor (and is addressed more fully below). However, a final judgment has not yet issued with respect to the Prior Decision. In fact, pending before the court is that certain Request for Rule 54(b) Judgment on 2001-Year Individual Income Tax (ECF No. 715) and the objections thereto (*see* ECF Nos. 723, 751) with respect to the Prior Decision. Accordingly, the court does not rely here on the doctrine of the law of the case. Rather, as explained below, the court remains persuaded by the rationale of the Prior Decision which was decided as a matter of law.

assessed, and no Notices of Deficiency had ever been mailed to the Debtor. (*See* Doc. I.D. Nos. 536 ¶ 10, 542 at 16.)

7E. The IRS asserted the alleged general unsecured claims for tax years 1988 through 1993 in proceedings before this court held on November 29, 2000 and January 4, 2001 in connection with the IRS Motion To Convert. (*See* Doc. I.D. Nos. 536 ¶ 11, 542 at 16-17.)

. . .

7G. The Debtor claims that the IRS asserted false tax claims before this court for tax years 1988 through 1993 in the 1998 Proof of Claim. (*See* Doc. I.D. No. 536 ¶ 14; *but see* Doc. I.D. No. 542 at 18.)

7H. The IRS also filed a proof of claim (the "2000 Proof of Claim") dated November 22, 2000 in the 2000 Case. In the 2000 Proof of Claim, the IRS asserted unsecured general claims amounting to $1,087,420.99 for tax years 1988 through 1996. On the 2000 Proof of Claim, the claims for tax years 1988 through 1993 were listed as "assessments pending," the claim for tax year 1995 as "assessed," and the claim for tax years 1994 and 1996 as "estimated." (*See* 2000 Case Proof of Claim No. 6.)

. . .

7J. The Debtor claims that the tax claims for tax years 1988 through 1993 (which the Debtor claims were false claims) were also asserted by the IRS in hearings before this court on November 29, 2000 and January 4, 2001. (*See* Doc. I.D. No. 536 ¶ 17; *but see* Doc. I.D. No. 542 at 19.)

7K. The total unsecured general claims, amounting to $1,087,420.99, appearing in the 2000 Proof of Claim were asserted by the IRS before this court (the Debtor claims) to defeat plan feasibility of the Chapter 13 Debtor. (*See* Doc. I.D. No. 536 ¶ 18; *but see* Doc. I.D. No. 542 at 19.)

7L. Prior to his entry into the Stipulation (and this court's approval of the same), the Debtor asserted to this court that the IRS had *no* valid tax claims against him. (*See* Doc. I.D. No. 164 (Debtor's Opposition to IRS Motion To Convert dated March 21, 2001) at 3-11;[31] Doc. I.D. No. 150 (transcript of 1/4/01 hearing) at 46:1-13[32].)

---

[31] *See, e.g.*, *id*. at 10 ("[T]he IRS has no statutory basis in a United States Tax Court to assert a single claim for a single tax dollar of liability!").

[32] So, I'm only asking for the opportunity to stay within this [chapter] 13. Let's get to the truth. I want the truth from the IRS as much as they want mine. I find it very interesting that – they they've never answered the question are there [sic] proof of claim statements for

8. On May 31, 2001, the Debtor, the IRS, and the DRS entered into the Stipulation which, among other things, provided for the conversion of this case from chapter 13 to chapter 11, and the Sale, pursuant to § 363, of the Property, with the Mortgage to be satisfied, but with the portion of the Mortgage repayment that would otherwise be distributed to CIIC (with Mr. Waters having the right to most of that distribution under his contract with CIIC), to be escrowed for certain purposes. (Doc. I.D. Nos. 529 ¶ 8, 535 at 8-11.)

8A. The Stipulation was entered into on May 31, 2001 by the Debtor and the IRS in relevant part in settlement of the IRS Motion To Convert. (*See* Doc. I.D. Nos. 170 (recitals) and related docket entry for June 1, 2001); 180 (order dated July 16, 2001 approving the Stipulation).)

(ECF No. 590 at 9-11.)

With respect to the allegation of fraud on the court, the court stated in the Prior Decision:

"Plainly the fact that false or misleading testimony was given during the course of a judicial proceeding does not constitute a fraud upon the court unless it appears that the court was so misled by such testimony as to render a decision based on a mistaken view of the material facts." *Interstate Investors, Inc. v. U.S.*, 287 F.Supp. 374, 382 (S.D.N.Y. 1968), *aff'd*, 393 U.S. 479 (1969). In this case, as a matter of law the court could not have been misled into converting the case to chapter 11 on the basis of the 1998 Proof of Claim and/or the 2000 Proof of Claim because the Debtor had made his opinion of those proofs of claim known to the court prior to his entry into the Stipulation. (*See* Uncontested Facts ¶ ¶ 7L, 8, 8A.) Accordingly, even assuming (but not deciding) that "fraud on the court" otherwise would apply, the court concludes that there was no "fraud on the court" here.

(ECF No. 590 at 23.)

---

1988 through 1992, alleging the amounts they did, $800,000.00 or so. Is it in fact accurate that there's been never a notice of deficiency, and is it accurate that the statute of limitations has run, and is it accurate that my filed returns show tax zero. If that's the case they've filed a misstatement of material fact here, that led directly to and would have pushed my property through foreclosure, without any available interest to the estate that would be necessary here.

(*Id*. (testimony of the Debtor).)

With respect to the allegation of fraud on the debtor, the court stated the following in a footnote (the "Footnote") in the Prior Decision:

> The Debtor is time barred here by the one year bar of Rule 60(b) of the Federal Rules of Civil Procedure from asserting any fraud that would not constitute a "fraud on the court." *See* Fed. R. Civ. P. 60(b) (made applicable here by Fed. R. Bankr. P. 9024).

(ECF No. 590 at 23 n.40.)[33]

On February 21, 2008, the Debtor filed a motion for reconsideration (ECF No. 594, the "First Motion") in respect of the Prior Decision challenging (among other things) the court's ruling on the fraud on the court issue.[34] Particularly, the Debtor argued that the court "used an abridged definition" of "fraud on the court" and misapplied applicable law with respect to the Debtor's claim of "fraud on the court" in the proceedings. (*See* First Motion at 4-5.) On July 14, 2008 (after oral arguments on the First Motion and the IRS's objection thereto, *see* ECF No. 600), the court issued that certain Brief Memorandum and Order Denying (on the Merits) Motion for Reconsideration and Sustaining Objection Thereto (*see* ECF No. 602). In that decision, the court stated in pertinent part:

> The Debtor argues that the alleged "fraud on the court" by the IRS and/or its attorneys (the existence of which the court assumes for this purpose only but does not find) had the requisite effect upon this case because it "corrupted" chapter 13 and/or chapter 11 confirmation proceedings. For the reasons stated in . . . [ECF No. 600] at pages 7 through 10 (inclusive), that argument is not persuasive to the court.

(ECF No. 602 at 4.)

On July 24, 2008, the Debtor filed a second motion for reconsideration (ECF No. 606, the "Second Motion") in which he contended (among other things):

---

[33] In addition to an affirmative defense of fraud, the Prior Decision also considered judicial estoppel and equitable estoppel. The court found against the Debtor on both of those affirmative defenses as a matter of law as well.

[34] In the First Motion, the Debtor did not address the fraud on the debtor issue.

> (1) the one year bar referred to by the court in the Footnote did not bar the "fraud on the debtor" affirmative defense as that defense properly was preserved by the Debtor in the timely filed Distribution Motion and documents filed in support of that motion; (2) even if the court is correct that the "fraud on the debtor" defense is barred by Rule 60, that determination has no preclusive effect on the defense as it pertains to the Distribution Motion; (3) with the exception of the Footnote, the court did not address the merits of the "fraud on the debtor" defense or its "foundation under the . . . [Distribution] Motion" but instead may have incorporated a discussion of the defense into the discussion of "fraud on the court" and/or equitable estoppel; (4) to the extent the court considered the "fraud on the debtor" defense, the court "misunderstood" the affirmative defense and "applied [it] to the Debtor's Equitable Estoppel argument involving the decision in" *City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994) (Second Motion at 11); (5) the IRS has never argued that the "fraud on the debtor" defense was barred by Rule 60(b)(3);[35] and (6) the court has never held an evidentiary hearing with respect to the alleged misconduct of the IRS, which misconduct gave rise to the "fraud on the debtor" defense.

(ECF No. 606.) On October 24, 2008, the court issued that certain Brief Memorandum and Order Denying Second Motion for Reconsideration (ECF No. 617). In that decision, the court stated in pertinent part:

> [A]ssuming, but not deciding, that the Footnote was erroneous, a defense of fraud on the debtor would be ineffective as a matter of law for the same reason that the Debtor did not prevail on the fraud on the court and equitable estoppel defenses, *to wit*, the Debtor cannot establish reliance in respect of the allegedly false proofs of claim because he raised the perceived problems with them before he entered into the Stipulation.

(*Id.* at 6.) However, in that decision, the court left for another day the issue of whether the "fraud on the debtor" defense properly was asserted (if at all) in the . . . [Distribution] Motion," (ECF No. 617 at 6).[36]

---

[35] The IRS conceded that point but the court determined that that concession did not constitute sufficient grounds for the court to reverse itself. (*See* ECF No. 617 at 4 n.8.)

[36] The court addresses below whether the Debtor raised the "fraud on the debtor" issue within the time period provided for by Rule 60(c)(1).

The Debtor made the "fabricated tax claim" allegation and that allegation was adjudicated by the court in the Prior Decision and upheld in two subsequent rulings on two motions for reconsideration filed by the Debtor. Here, the Debtor makes the same "fabricated tax claim" argument as the basis for his fraud allegations. However, notwithstanding the Debtor's restatement of his fraud allegations in the Objection and Cross-Motion, the court remains persuaded that its prior ruling with respect to those allegations was correct as a matter of law. Consequently, the Stipulated Order cannot be set aside for fraud pursuant to Rule 60(b)(3).

**2. Duress/One-Year Bar**

Rule 60(b)(3) also covers "misconduct by an opposing party" including duress. *Cf. Leisure Corp. v. Prochnow (In re Leisure Corp.*), No. C-03-03012RMW, 2007 WL 607696 (N.D. Cal. Feb. 23, 2007). As noted above, Rule 60(c)(1) requires a party to seek relief under Rule 60(b)(3) within one year of the subject judgment or order. *See* Fed. R. Civ. P. 60(c)(1). That one-year time limit is "absolute." *Warren*, 219 F.3d at 114. While it may be that the Debtor stated he felt threatened at the hearing on November 29, 2000, he did not request that the court vacate the Stipulated Order because of duress in the Distribution Motion or any other representation made to the court before July 16, 2002. Therefore, as a matter of law, the time bar of Rule 60(c)(1) renders it improper for the court to vacate the Stipulated Order for duress under Rule 60(b)(3).

**E. No "Mistake, Inadvertence, Surprise, or Excusable Neglect" Has Been Alleged (Rule 60(b)(1)/One Year Bar)**

Under Rule 60(b)(1), the court may grant relief from a judgment for "mistake, inadvertence, surprise or excusable neglect." Fed. R. Civ. P. 60(b)(1). A motion under Rule 60(b)(1) is subject to the "absolute" one year limitation period imposed by Rule 60(c)(1). *See* Rule 60(c)(1) ("A motion under Rule 60(b) . . . for reason[] (1) [must be made] no more than a year after the entry of

the judgment or order . . . ."). The provision generally is "invoked to remedy the mistake of a party or his representatives." *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754, 759 (2d Cir. 1981). "[R]elief will not be granted under Rule 60(b)(1) merely because a party is unhappy with the judgment. Instead the party must make some showing of why he was justified in failing to avoid mistake or inadvertence." 11 C. A. Wright, A. R. Miller & M. K. Kane, *Federal Practice and Procedure* § 2858, at 276-77 (2 ed. 1995). A party is bound by the acts and omissions of his attorney. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97 (1993). "*Pro se* litigants are normally held to the same standard." *Baldiga v. Bowdring (In re Cyphermint, Inc.)*, No. 09-40138-FDS, 2011 WL 2417132, at *4 (D. Mass. June 10, 2011).

Here, the Debtor has not made any colorable claims of mistake, surprise, neglect or the like upon which the Stipulated Order might be set aside pursuant to Rule 60(b)(1). Accordingly, the court determines that Rule 60(b)(1) does not apply here. In any event, any Rule 60(b)(1) claim would be time barred pursuant to Rule 60(c)(1).

### F. No "Newly Discovered Evidence" within the Purview of Rule 60(b)(2)/One-year Bar

Rule 60(b)(2) provides that a party may seek relief from judgment based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). Similarly, a motion under Rule 60(b)(1) is subject to the "absolute" one year limitation period imposed by Rule 60(c)(1). *See* Rule 60(c)(1) ("A motion under Rule 60(b) . . . for reason[] (2) [must be made] no more than a year after the entry of the judgment or order . . . ."). Under Rule 60(b)(2), a party must show that:

> (1) newly discovered evidence is of facts existing at the time of [the prior decision]; (2) the moving party is excusably ignorant of the facts despite using due diligence to learn about them; (3) the newly discovered evidence is admissible and probably

> effective to change the result of the former ruling; and (4) the newly discovered evidence is not merely cumulative . . . of evidence already offered."

*American Civil Liberties Union v. Dep't of Defense*, 406 F. Supp. 2d 330, 332 (S.D.N.Y. 2005) (citation and internal quotation marks omitted; alteration in original). This rule is "aimed at correcting erroneous judgments based on the unobtainability of evidence . . . ." *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir.1995).

In the S/J Motion, the IRS mentioned that, in a previous submission to the court (*see* ECF No. 594), the Debtor argued that through IRS tax account transcripts obtained through a Freedom of Information Act request in 2004, he discovered a prepetition assessment statute expiration date in respect of certain taxes, which was not known to the Debtor prior to entering into the Stipulation. (*See* ECF No. 694 at 7.) According to the IRS, the Debtor contends that the tax transcripts constitute newly discovered evidence that the relevant IRS tax claim was fraudulent. (*See id.*)[37]

As noted by the IRS, the expiration of the relevant statute of limitations in respect of the Debtor's taxes was known by the Debtor at the 11/29/00 and 1/4/01 hearings. At the 11/29/00 hearing, the Debtor testified in relevant part:

> And they haven't showed me one notice of deficiency. There has been not one letter that's arrived to tell me how they got to . . . [the assessment]. When we make that motion, I want to see how they come back. A motion to compel the production of deficiency letters, because when I ask for them, I should have a right to them. Forget whether those taxes are collectible, because your three year statute of limitations has run without them. I think it's a disgrace that you would file documents in court like that, without absolutely having . . . legal assessments, pursuant to your statutes.

(ECF No. 142 at 139:14-25.) At the 1/4/01 hearing, the Debtor testified in relevant part:

---

[37] The Debtor does not make that argument or raise the expiration of the statute of limitations issue in the Objection and Cross-Motion.

> The important statement here is that in the proof of claim of the IRS for those years, 1988 through 1993, they indicate approximately $815,000.00 of tax liability. Approximately $600,000.00 of which the statute of limitations has run on.
>
> . . .
>
> I sit here and I feel like I'm in a catch 22. They're seeking to have the property go through a foreclosure, providing I don't have it. And they're not addressing the fact that the proof of claim that they filed with $815,000.00 of tax liabilities, not only can't they support it, the statute of limitations has run . . . .
>
> So, I'm only asking for the opportunity to stay within this 13. Let's get to the truth. I want the truth from the IRS as much as they want mine. I find it very interesting that . . . they've never answered the question are there proof of claim statements for 1988 through 1992, alleging the amounts they did, $800,000.00 or so. Is it in fact accurate that there's been never a notice of deficiency, and is it accurate the statute of limitations has run, and is it accurate that my filed returns show tax zero. If that's the case they've filed a misstatement of material fact here . . . .

(ECF No. 150 at 39:2-6, 42:20-25, 46:1-13.)

Here, the Debtor is unable to satisfy the elements set out in *American Civil Liberties Union*, *supra*. The evidence in respect of the fabricated tax claims, including the running of the statute of limitations, was known to the Debtor (and asserted by him at two hearings) prior to the entry of the Stipulated Order. Consequently, he was not "excusably ignorant" of that evidence. Further, any Rule 60(b)(2) claim would be time barred under Rule 60(c)(1).

**G. <u>Conversion and Issuance of the Discharge (Rule 60(b)(5) and 11 U.S.C. § 348)</u>**

Rule 60(b)(5) permits relief from a final judgment if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable . . . ." Fed. R. Civ. P. 60(b)(5). Construing the Debtor's arguments broadly in his favor, the Debtor argues that (i) the Stipulated Order was "discharged" when the Discharge entered (allegedly in accordance with 11 U.S.C. § 348(d) and/or

*Local Loan*)[38] and/or (ii) applying the Stipulated Order prospectively is no longer equitable in light of the Conversion and Discharge. The court will address each argument in turn.

The Debtor argues that the Conversion turned nondischargeable taxes into dischargeable taxes. That is not true. With respect to the Gains Tax, in a "two taxable entities" situation such as this case, taxes incurred by the chapter 11 estate (here, the Gains Tax) are not liabilities of the chapter 11 debtor and conversion to chapter 7 does not change that. *See Bellus v. United States*, 125 F.3d 821, 823 (9th Cir. 1997) (concluding that discharged chapter 7 debtor not liable for employment taxes for wages paid by the chapter 11 debtor-in-possession/estate postpetition but preconversion). Accordingly, the concept of discharge is irrelevant to the Gains Tax.

With respect to the remaining tax claims, pursuant to 11 U.S.C. § 348(d) and whether or not a postpetition, preconversion claim against the estate or the debtor is deemed to be an administrative claim under 11 U.S.C. § 503(b), for discharge purposes the claim is deemed to have "arisen immediately before the date of the filing of the petition." *See Fickling v. Flower, Medalie & Markowitz, Esqs. (In re Fickling)*, 361 F.3d 172, 175 (2d Cir. 2004). Accordingly, 11 U.S.C. § 523(a) is applied to the postpetition/preconversion claim in the same manner as to any other prepetition claim. *See Fickling, supra.* In *Fickling,* the claim was discharged because there was no applicable exception to discharge under Section 523(a). *See Fickling, supra.* Here, 11 U.S.C. §§ 523(a)(1) and 523(a)(7) make all or substantially all of the subject taxes nondischargeable. *Cf. Harvey v. Lewandowski (In re Lewandowski)*, 325 B.R. 700 (Bankr. M.D. Pa. 2005) (finding

[38] The Stipulated Order is a mechanism to pay the Gains Tax and the Debtor's individual tax liabilities. The Debtor argues (erroneously as discussed below) that the Gains Tax and his personal tax liabilities were discharged by the Discharge. That, the Debtor argues, also "discharged" the Stipulated Order.

postpetition, preconversion claim under 11 U.S.C. § 523(a)(19) nondischargeable after conversion from chapter 13 to chapter 7). In short, except perhaps for some sufficiently old tax debts (*cf.* 11 U.S.C. §§ 523(a)(1), 507(a)(2), 507(a)(8) (time limitations)), currently existing tax debts of the Debtor individually are nondischargeable in this case pursuant to Section 523(a). Furthermore, as discussed above, the Gains Tax is not the liability of the Debtor individually and, accordingly, the Discharge is irrelevant to that claim.[39] Given all of the foregoing, the Discharge cannot be said to have "discharged" the Stipulated Order within the purview of Rule 60(b)(5).

The Debtor also appears to argue that applying the Stipulated Order prospectively "is no longer equitable" post-Discharge within the purview of Rule 60(b)(5). The court is unpersuaded by that argument for two reasons. First, for the subject language to apply, the order under challenge must be essentially prospective in nature. *See DeWeerth v. Baldinger,* 38 F.3d 1266, 1275 (2d Cir.), *cert. denied,* 513 U.S. 1001 (1994). The Stipulated Order is not essentially prospective in nature. That is because the Stipulated Order created the Escrow and established the rights with respect to it. (*See* ECF No. 180.) Any prospective aspect of the Stipulated Order is incidental to that central feature. *Cf. DeWeerth,* 38 F.3d at 1276. Accordingly, the subject clause of Rule 60(b)(5) cannot be used to attack the Stipulated Order. In any event, the Debtor has not made any colorable claim that it is "no longer equitable" to enforce the Stipulated Order even if it were to be deemed to be sufficiently prospective in nature.

---

[39] Moreover, the fact that the relevant claims are nondischargeable or otherwise are outside the scope of the Discharge takes this matter outside the purview of *Local Loan* which dealt with a discharged debt. *See Local Loan, supra.*

**H. <u>No Other Reason Justifies Relief (Rule 60(b)(6))</u>**

Rule 60(b)(6) "grants federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). *See also Warren*, 219 F.3d at 114 ("Rule 60(b)(6) only applies if the reasons offered for relief from judgment are not covered under the more specific provisions of Rule 60(b)(1)-(5)."). Further, Rule 60(b)(6) cannot be used to "circumvent the 1-year limitations period" that governs Rule 60(b)(1), (2) and (3). *Liljeberg, supra* at 863 n.11.

To obtain relief under Rule 60(b)(6), the movant must prove "extraordinary circumstances or . . . [that] the judgment may work an extreme and undue hardship." *DeWeerth*, 38 F.3d at 1272 (citation and internal quotation marks omitted). *See also Simon v. Navon*, 116 F.3d 1, 5 (1st Cir. 1997) (finding that a party must make a showing of "'exceptional' circumstances that justify 'extraordinary' relief"). "Courts generally find extraordinary circumstances warranting relief under Rule 60(b)(6) only where the movant was not at fault in his predicament, and was unable to take steps to prevent the judgment from which relief is sought. *See* 12 James Wm. Moore, *Moore's Federal Practice* § 60.48[3][c] (3d ed.2005) ('fault by movant usually means [a] lack of extraordinary circumstances')." *Aja v. Fitzgerald (In re Aja)*, 441 B.R. 173, 178 (B.A.P. 1st Cir. 2011) (citation and internal quotation marks omitted).

Based on the record here and the allegations made, other paragraphs of Rule 60(b) are more applicable to this matter. Accordingly, because those provisions are more appropriate, relief under Rule 60(b)(6) is not available. Moreover, here the Debtor created his own predicament when he

entered into the Stipulated Order. *Cf. SE Technologies, Inc. v. Summit Elec. Supply, Inc.*, 392 F. Supp. 2d 399 (D. Conn. 2005) (same result under Rule 60(d)(1) analysis (*see* part V, below)). Further, the Debtor has not made a colorable claim that "extraordinary circumstances" exist here to make Rule 60(b)(6) applicable.

## V. ANALYSIS (INDEPENDENT ACTION TO SET JUDGMENT ASIDE)

Rule 60(d)(1) provides the court with discretion to entertain independent actions for relief from final judgments. *See* Fed. R. Civ. P. 60(d)(1); *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 661 (2d Cir. 1997). Because "[a] party is not bound by the label he puts on his papers[,] [a] motion may be treated as an independent action or vice versa as is appropriate." *Weldon v. United States*, 70 F.3d 1, 5 (2d Cir. 1995) (citation and internal quotation marks omitted). In this circuit, in order to prevail in an independent action seeking equitable relief, the complainant must prove three elements: (1) that the independent action is the only available or adequate remedy; (2) that the circumstances from which he seeks relief are not the result of the movant's "fault, neglect, or carelessness;" (3) and that there is a "recognized ground-such as fraud, accident, or mistake-for the equitable relief." *Campaniello Imports*, 117 F.3d at 662 (denying Rule 60(d)(1) relief where party could have obtained relief via Rule 60(b)(3) had it not slept on its rights and missed the one-year time limit). *See also SE Technologies. Inc. v. Summit Elec. Supply, Inc.*, *supra* (holding that movant who entered into stipulated judgment which assigned a legal malpractice claim was not entitled to Rule 60(d)(1) relief where movant was "largely responsible for creating the present situation because it negotiated, signed and submitted the stipulated judgment, and asked the court to approve it, without notifying the court of a potential issue concerning the propriety of the assignment."). Further, "[a]lthough both clause 3 and the saving provision of Rule 60(b) provide

for relief from a judgment on the basis of fraud, the type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion." *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir.1988).

The Debtor cannot prevail in an independent action under Rule 60(d)(1) as a matter of law because he fails to meet each of the three required elements based on the undisputed facts of the case. First, the Debtor had other relief available. If he truly believed the Taxing Authorities had forced him to sign the Stipulated Order against his will or had induced him to do so through fraud, the Debtor could have stated that explicitly in the Distribution Motion or at any time before July 16, 2002. Just as in the *Campaniello* matter, the Debtor slept on his rights to bring this claim under Rule 60(b)(3), and would only seek relief under Rule 60(d)(1) to maneuver around the time requirements that Rule 60(c)(1) imposes on Rule 60(b)(3). Second, the Debtor created the circumstance from which he seeks relief because he negotiated and signed the Stipulation (and submitted it for approval) while he was represented by counsel, like the complaining party in the *SE Technologies* case. Lastly and as noted above, the Debtor's case for fraud or duress is not even arguable. Accordingly, as a matter of law the Debtor could not meet the more stringent standards for proving fraud under Rule 60(d). *See Gleason, supra*.[40]

## VI. CONCLUSION

For the foregoing reasons, the court concludes that (1) the Debtor is not entitled to relief from the Stipulated Order and, therefore, the S/J Motion must be granted; (2) due to the granting of the S/J Motion, the Debtor is not entitled to the immediate distribution of the remaining balance of the

---

[40] The court has considered the Debtor's remaining arguments for relief from the Stipulated Order and finds and/or concludes that they are inapposite or otherwise unpersuasive.

Escrow Fund and, therefore, the Distribution Motion must be denied; and (3) the Objection and

Cross-Motion is overruled and denied.

**IT IS SO ORDERED.**

Dated: August 23, 2011                              BY THE COURT

Lorraine Murphy Weil
Chief United States Bankruptcy Judge